1  LISA L. OBERG (BAR NO. 120139)
   loberg@mckennalong.com
2  FELICIA Y. FENG (BAR NO. 184346)
   ffeng@mckennalong.com
3  MCKENNA LONG & ALDRIDGE LLP
   101 California Street
4  41st Floor
   San Francisco, CA  94111
5  *Telephone:*     (415) 267-4000
   *Facsimile:*     (415) 267-4198
6  Attorneys for Defendant
   METALCLAD INSULATION CORPORATION
7

8              UNITED STATES DISTRICT COURT

9           NORTHERN DISTRICT OF CALIFORNIA

10 FRANK DELAHAYE,                        CASE No.

11              Plaintiff,                DECLARATION OF DAN H. HEFLIN, JR.
                                          P.E. IN SUPPORT OF METALCLAD
12         v.                             INSULATION CORPORATION'S NOTICE
                                          OF REMOVAL PURSUANT TO 28 U.S.C.
13 ASBESTOS DEFENDANTS, As Reflected      1442(A)(1) (FEDERAL OFFICER)
   on Exhibits B, B-1, C, H, I, J, N and DOES
14 1-8500, et al.,

15              Defendants.

16

17

18

19

20

21

22

23

24

25

26

27

28

McKenna Long &
Aldridge LLP
Attorneys At Law
San Francisco

1  I, Dan H. Heflin, Jr., P.E., declare:

2

3      1.      I am over the age of eighteen and am not a party to this action.  I have personal

4  knowledge of the matters set forth in this declaration.  If called as a witness, I could and would

5  competently testify to the following.

6      2.      I graduated from Virginia Polytechnic Institute with a Bachelor of Science Degree

7  in industrial engineering in 1956.  I am a registered Professional Engineer in Virginia since 1968.

8      3.      I am a retired Director of Engineering at Newport News Shipbuilding and Drydock

9  Co. ("NNSD")—the largest privately-owned shipbuilding company in the world.  I worked for

10  NNSD from 1956 through 1992.  During my 36-year career at NNSD, I worked in various

11  positions within the Shipbuilding Segment, including Designer, Design Section Manager,

12  Manager of Submarine Design, and Director of Engineering Services.

13      •  As a Designer, I reviewed and processed boiler drawings for numerous

14          commercial and naval vessels.  That work involved reviewing and

15          recommending changes to vendor-furnished drawings to assure compliance

16          with applicable Navy and commercial specifications and standards.  I also

17          worked closely with the Navy's Supervisor of Shipbuilding and/or

18          NAVSHIPS Command regarding approvals for issue of drawings and

19          associated technical manuals.  I also designed numerous components (and

20          supporting systems) for the *USS America* (CVA-66) as a Designer.

21      •  As a Design Section Manager, I prepared SSN-688 Class contract drawings

22          and technical specifications for the Naval Seas System Command.  That

23          work involved technical oversight of all aspects of the non-nuclear portions

24          of an entirely new class of nuclear attack submarines.  Creating the

25          specifications for Naval Seas System Command involved intensive design

26          studies and an understanding of the Navy's goals and objectives for this

27          class of vessels, as well as constant communications with Naval Seas

28          System Command officials.

McKenna Long &
Aldridge LLP
Attorneys At Law
San Francisco

- 2 -

1       •       In approximately 1971, the U.S. Navy designated NNSD the "lead yard

2                design agent" and "planning yard" for the life cycle support for all SSN-

3                688- Class submarines. As Design Section Manager of the Submarine

4                Design Office, and later as Manager of Submarine Design, I worked

5                closely with the U.S. Navy Supervisor of Shipbuilding and Naval Sea

6                Systems Command to resolve design issues and construction and

7                maintenance issues associated with the lead ship and all follow-on 688-

8                Class ships. I also worked with then-Commander Wesley C. Hewitt to

9                resolve design, construction, maintenance, and overhaul matters

10               concerning 688-CLASS ships at various naval shipyards.

11       •       As a Director of Engineering Services, I was responsible for design and

12               engineering activities for nuclear and non-nuclear vessels.

13      4.      After retiring from NNSD in 1992, I formed Heflin & Williams, an engineering

14 consulting firm, which is located at 208 East Plume Street, Norfolk, Virginia 23510. Heflin &

15 Williams provides engineering-related services to private industry and to government agencies. I

16 have performed cost-engineering and production engineering analyses for various government

17 subcontractors. My work has also included analysis of governmental specifications and material

18 and facility requirements for conversion overhauls by commercial shipyards. I have also served

19 as a consultant to Navy contractors regarding their qualification and compliance with government

20 specifications.

21      5.      I submit this declaration in support of Defendant Metalclad Insulation

22 Corporation's Notice of Removal to Federal Court to present my opinions relative to the

23 procurement of Unibestos Thermal insulation pursuant to the 1968 Award Contract from Mare

24 Island Naval Shipyard to Metalclad Insulation Corporation for a shipment of Pittsburgh Corning

25 Unibestos Insulation.

26      6.      It is my understanding, based upon review of Plaintiff's Complaint that Plaintiff

27 claims to have suffered exposure to Metalclad supplied Unibestos thermal insulation while

28 working as a Marine Machinist Apprentice, a Journeyman Machinist, a Nuclear Inspector, and a

MCKENNA LONG &
ALDRIDGE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    Tester on board the *USS Guitarro*, the *USS Drum*, the *USS Hawkbill*, and the *USS Pintado* at

2    Mare Island Naval Shipyard from 1965 to 1991.

3         7.     It is also my understanding, based upon my review of the Award Contract

4    ("Purchase Order"), the Material Cards for Unibestos shipped to Mare Island Naval Shipyard, the

5    correspondence from Pittsburgh Corning Corporation to government personnel at Mare Island

6    Naval Shipyard regarding the Unibestos shipment, and Wilfred Newton's trial testimony, that in

7    1968 Metalclad Insulation Corporation brokered a shipment of Pittsburgh Corning Unibestos

8    Insulation for use in the construction of four nuclear submarines being constructed at Mare Island

9    Naval Shipyard: the *USS Guitarro*, the *USS Drum*, the *USS Hawkbill*, and the *USS Pintado*.

10        8.     Attached hereto are true and correct copies of the following Exhibits, which I

11   reviewed in preparation of this Declaration and which are central to the allegations in this matter:

12       •     Exhibit 1: Award/Contract N000445-69-C-0137, confirming Award Notice

13                dated August 3, 1968.

14       •     Exhibit 2: MIL-I-2781 and its associated QPL, and its predecessor Navy

15                Specification P-8 and its associated QPLs and Approved Materials Lists

16                which preceded the implementation of QPLs.

17       •     Exhibit 3: Correspondence between Pittsburgh Corning and Mare Island

18                Naval Shipyard regarding the shipment of Unibestos pursuant to the

19                Metalclad Purchase Order.

20       •     Exhibit 4: Mare Island Stock Cards associated with receipt and issue of the

21                subject Unibestos.

22       •     Exhibit 5: MIL-I-24244.

23       •     Exhibit 6: Defense Standardization Program Office publication, SD-20.

24                "The DOD Qualification Program", January 2002.

25       •     Exhibit 7: Statement of Rear Admiral. Paul E. Sullivan, U.S. Navy, Deputy

26                Commander for Ship Design, Integration and Engineering, Before the

27                House Science Committee On The SubSafe Program, 29 October, 2003.

28

MCKENNA LONG &
ALDRIDGE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DECLARATION OF DAN H. HEFLIN, JR. P.E. IN SUPPORT OF METALCLAD INSULATION CORPORATION'S NOTICE OF REMOVAL PURSUANT
TO 28 U.S.C. 1442(A)(1) (FEDERAL OFFICER)

1

- Exhibit 8: U.S. Naval Engineering Experiment Station Report No. 7737,

2
dated July 31, 1936, Preliminary Report on Unibestos Sectional Pipe

3
Covering.

4
- Exhibit 9: U.S. Naval Engineering Experiment Station Report No. 8321,

5
dated December 16, 1937, Insulation, Pipe Covering, and Block Unibestos.

6
- Exhibit 10: Scanned copies of two local Newspaper articles regarding a

7
recent and on-going revelation of welding inspection fraud by a company

8
(Northrup Grumman) inspector, and the Navy's reactions thereto.

9     9.     In order to establish the perspective from which to review the circumstances of this

10  issue, one must have a full understanding of the Navy's material and process requirements and

11  the depth to which its concern for ship's safety and reliability dictate those requirements.

12  Following is a brief summary of the essence of those concerns and the policies adopted to ensure

13  satisfactory compliance by all parties involved.

14          A.     Through my education, training and work experience, I have developed

15                 expertise regarding United States Navy ship and submarine design,

16                 development, maintenance, construction and repair, including the

17                 mandatory compliance with military specifications and the level of control

18                 and supervision exercised by the United States Navy over all equipment

19                 installed aboard a United States Navy vessel.

20          B.     The Navy operates under a regimented, formal, disciplined system of

21                 design and material control. Because of the criticality and inherent danger

22                 of many systems aboard ship, the Navy has established a rigid system to

23                 assure that only proper materials are available for and used in the

24                 construction and repair activities at any level. The extent of the Navy's

25                 concern is dramatically illustrated by the welding materials issue reported

26                 in Exhibit 10.

27          C.     With the advent of Nuclear Power and its introduction into naval ships, the

28                 Navy established separate command control of all aspects of nuclear power

MCKENNA LONG &
ALDRIDGE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 5 -

DECLARATION OF DAN H. HEFLIN, JR. P.E. IN SUPPORT OF METALCLAD INSULATION CORPORATION'S NOTICE OF REMOVAL PURSUANT
TO 28 U.S.C. 1442(A)(1) (FEDERAL OFFICER)

1   applications.  That command and control structure is NavSea Code 08

2   (formerly Nuclear Type Desk in BuShips and NavShips Code 08), and has

3   absolute control over all matters involved in any way with nuclear power.

4   In the exercise of such control, entirely new and independent requirements

5   were established and put into effect to provide the level of assurance

6   deemed necessary to NavSea Code 08.  Specifically, the navy established

7   new and more stringent requirements for a host of material applications,

8   among which was Mil-I-24244, Exhibit 5.

9   D.   The systems of assurance and control were further strengthened by the

10       Navy's response to the loss of *USS Thresher* in 1963.  The program created

11       to assure significantly upgraded controls was, and remains, "The

12       Submarine Safety Certification Program", popularly known as "SubSafe",

13       and is described in significant detail in RADM Paul E. Sullivan's

14       Statement to the (US Congress) House Science Committee on 28 October,

15       2003, Exhibit 7.  That program provides additional emphasis and

16       mandatory procedures to assure the adequacy of every item that in any way

17       affects the submarine pressure hull watertight boundary and/or the ability

18       of the submerged ship to recover from flooding.  The propulsion system is

19       a critical component of the recovery capability, and the associated piping is

20       a critical element of the propulsion system.  Thus, the insulation applied to

21       that piping must be free of corrosion.  The MIL-I-24244 requirements for

22       additional requirements for assurance of freedom from corrosive materials

23       is an element of "SubSafe".  That certification is the key requirement of the

24       specification.

25  E.   The Navy's design systems are clearly established and promulgated by a

26       series of specifications, directives, and instructions.  Moreover, the Navy

27       maintains an all-encompassing inspection program to assure that the

28

MCKENNA LONG &
ALDRIDGE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    requirements of the specifications, directives, and instructions are complied

2    with and certifications of same are recorded.

3    F.    The Navy, through Naval Sea Systems Command or the Bureau of Ships,

4          exclusively prepared, drafted and issued specifications for thermal

5          insulation and approved all such thermal insulation produced for the Navy.

6          Before a manufacturer like Pittsburgh Corning received authorization to

7          manufacture selected equipment or materials such as thermal insulation for

8          use by the Navy, all of the design documentation first had to be approved

9          by the Navy.  These inspections and approvals were the responsibility of

10         the Bureau of Engineering and its successor organizations, the Bureau of

11         Ships, Naval Ship Systems Command and Naval Sea Systems Command.

12         The Navy frequently required changes in design, materials and

13         documentation before approving the design and authorizing the

14         manufacture of the equipment and materials for use aboard its vessels.

15   G.    Military specifications for thermal insulation and other equipment used

16         aboard Navy vessels were drafted, approved and maintained by the Navy,

17         specifically the Naval Sea Systems Command.  The Naval Sea Systems

18         Command controlled the military specifications in large part because it had

19         superior knowledge of the demands and requirements of combat-ready

20         vessels.  Military specifications address all aspects of shipboard equipment

21         and materials requirements, including whether these materials contained

22         asbestos and reflect the state of the art and the special needs of the Navy's

23         combat vessels.

24   H.    The Navy had unique specifications for thermal insulation used aboard

25         nuclear powered submarines.  These specifications were communicated to

26         outside vendors, including Pittsburgh Coming, by the Navy in Requests for

27         Proposals for certain equipment and materials.

28

McKenna Long &
Aldridge LLP
Attorneys At Law
San Francisco

- 7 -
DECLARATION OF DAN H. HEFLIN, JR. P.E. IN SUPPORT OF METALCLAD INSULATION CORPORATION'S NOTICE OF REMOVAL PURSUANT
TO 28 U.S.C. 1442(A)(1) (FEDERAL OFFICER)

I.    The Navy also has a complex supply system for the procurement of materials used aboard ships. Materials intended for nuclear applications are procured beyond the Navy's standard material ordering practices and under the purview of the Commands responsible for nuclear power; in the case of submarines, NavSea Code 08. Materials intended for nuclear applications are segregated throughout the complete supply system, and expressly restricted to nuclear use. Evidence of that restriction in practice is documented in the material stock cards, Exhibit 4, wherein the restriction was lifted for surplus materials after completion of the intended ships, and the materials released for non-nuclear use. Part of the Navy's system includes the QPL, which are comprehensive lists of selected Navy-approved products (e.g., insulation, electrical switches, cements, lubricants, valves, etc.) citing Navy-approved manufacturers/suppliers, specific to that sole commodity. Through the QPL program, and the predecessor Navy Approved Materials List, vendors of materials with repeated or frequent use by the military can pre-qualify their product(s) through a Navy testing program which penults future acquisitions of that identical product to be procured without further testing. Such pre-qualified vendors are recorded on a QPL generated for certain Military Specifications. A QPL certifies listed vendor's proven compliance with the base specification for a product. Exhibit 7 explains the origin and application of QPLs.

J.    Once a QPL is established, the Navy can select a pre-qualified vendor's product that fits the Navy's needs for a particular application, as expressed in the associated specification. A manufacturer's/supplier's product that appears on a QPL falls within a specific range of performance parameters required by the Navy and articulated in the associated specification.

K.    Once a product listed on the QPL becomes subject to a special certification, the QPL is no longer applicable for that specific procurement, i.e., the

MCKENNA LONG &
ALDRIDGE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 8 -

DECLARATION OF DAN H. HEFLIN, JR. P.E. IN SUPPORT OF METALCLAD INSULATION CORPORATION'S NOTICE OF REMOVAL PURSUANT
TO 28 U.S.C. 1442(A)(1) (FEDERAL OFFICER)

1  product as identified on the QPL, which is the baseline specification only,

2  is not suitable for use on the particular vessel or class of vessels whose

3  precise design interest the Navy is contemplating because that particular

4  vessel or class of vessels requires a stricter requirement not guaranteed by

5  the products listed in the QPL.

6  L.  Where the Navy requires that production of a product or material such as

7  the subject lot of Pittsburgh Corning Unibestos meet standards beyond

8  those required by the specification and its associated QPL, the Navy may

9  invoke additional oversight of the production of the product using on-site

10  government inspectors. These inspectors are called Defense Contractor

11  Administration Service representatives ("DCAS"), and are employees of

12  the U.S. Navy. It is DCAS's responsibility to ensure that vendors such as

13  Pittsburgh Corning follow the total required contract specifications during

14  production. DCAS is present during production and monitors the vendor's

15  testing of the product to ensure that the vendor complies with each and

16  every requirement specified in the Navy's testing procedures. DCAS also

17  independently reviews, inspects and tests the product prior to shipment.

18  DCAS serves as the on-site "eyes and the ears" of the government and has

19  the final say as to whether the production complies with the Navy's

20  specification and whether it will ultimately be cleared to be sent to its

21  contracted destination. The documentation (Exhibits 1, 3 & 4), reflecting

22  the production, testing and sale of the Pittsburgh Corning Unibestos that

23  was brokered to Mare Island Naval Shipyard shows that a DCAS was

24  present overseeing and approving the manufacture of the production lot.

25  M.  Navy specifications also addressed the nature and type of any marking

26  and/or labeling placed on all equipment and materials supplied by outside

27  contractors, including thermal insulation. The Navy utilized its own

28  warning and training protocols regarding the use of materials and processes

MCKENNA LONG &
ALDRIDGE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 9 -

DECLARATION OF DAN H. HEFLIN, JR. P.E. IN SUPPORT OF METALCLAD INSULATION CORPORATION'S NOTICE OF REMOVAL PURSUANT
TO 28 U.S.C. 1442(A)(1) (FEDERAL OFFICER)

1    it considered to be a hazard or threat to combat effectiveness. Any attempt

2    by a vendor such as Pittsburgh Corning or a supplier such as Metalclad to

3    attach a warning or cautionary statement not specified and approved by the

4    Navy would likely have been unwelcome. The Navy had established its

5    own training and adopted its own precautionary measures regarding the use

6    of asbestos and asbestos containing products.

7    N.    The Navy also had specifications addressing the form and content of

8    written materials to be delivered with, products supplied to the Navy, and

9    these specifications contained explicit direction regarding the type of

10    information to be included. This included any and all cautions and

11    warnings. It is highly unlikely that Pittsburgh Corning or Metalclad would

12    have been allowed to include a warning not required and approved by the

13    Navy. Any attempt to include a cautionary warning without prior Navy

14    approval would have been prohibited as a violation of Military

15    Specifications because the Navy addressed hazards such as asbestos though

16    training, not through warnings.

17    10.    I personally reviewed the Award Contract/Purchase Order and correspondence

18    from Pittsburgh Corning to Mare Island nuclear procurement personnel (Exhibits 1 & 3). That

19    purchase order clearly invokes the requirements of MIL-I-24244 (Exhibit 5), Type 1 and

20    Amendment 1, plus the requirements of MIL-1-2871. MIL- I-24244 is titled "Insulation Material

21    With Special Corrosion, Chloride and Fluoride Requirements (ISSE Controlled Further

22    Dissemination Only As Directed By NAVSEA System C-9B2)." It is patent that MIL-I-24244

23    specifies special corrosion, chloride and fluoride requirements above and beyond what is

24    permitted under the specification and its associated QPL. (Exhibit 5, Bates pages 61312-61315.)

25    MIL-I-24244 was highly classified until 2004.

26    11.    MIL-I-24244 section 3.31 requires that "the specific material supplied" must be

27    analyzed. (Exhibit 5, Bates page 61312.) MIL-I-24244 section 4.3.1 demonstrates that the Navy

28    imposed pre-production testing of this material by each supplier. That section requires that the

MCKENNA LONG &
ALDRIDGE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 10 -

1   "corrosion test shall be performed as a preproduction test by each supplier...It need not be

2   repeated for subsequent orders from any source unless required by the ordering data." (Exhibit 5,

3   Bates page 61315.) Thus, the Pittsburgh Corning Unibestos then listed on QPL 2781 (Exhibit 2)

4   could not qualify for sale to Mare Island under the procurement order cited. That procurement

5   was designated for specific end-use on specific submarines in the nuclear areas. Pittsburgh

6   Corning was required to subject its Unibestos to two additional chemical analysis tests in

7   accordance with MIL-1-24244 (Ships), and verified by the local government inspector (DCAS)

8   prior to shipping the Unibestos to Mare Island. The combined requirements of both specification

9   assured that the insulation met the Navy's requirements for use aboard the *USS Guitarro*, the *USS*

10  *Drum*, the *USS Hawkbill*, and/or the *USS Pintado*. Even though the material being procured, such

11  as this lot of thermal insulation, is compliant with both of the invoked specifications in every

12  respect, either by prior or compliant testing and certification, the navy may require additional

13  testing to ensure to its satisfaction the precise chemical makeup of that specific material lot. That

14  is exactly what occurred in this subject procurement. That additional testing was originally

15  performed by the manufacturer as witnessed by the DCAS inspectors, and confirmed by the

16  specific lot testing by the Laboratory's Receipt Inspection, Code M-136B on 3/9/69. Thus, it is

17  obvious that the navy controlled the procurement of this lot of insulation in every respect.

18          12.     The Navy's requirement that Pittsburgh Corning certify the shipment of Unibestos

19  in accordance with MIL-1-24244 indicates that, even before it left the Pittsburgh Corning factory,

20  the Navy effectively controlled the manufacture of this production lot. In fact, the Navy played a

21  key role in the original development of Unibestos in 1936 and 1937 as shown in Exhibits 8 and 9.

22          13.     Those Exhibits are the Navy's own test reports on samples of Unibestos insulation

23  products provided to the Navy's Engineering Experiment Station to gain Navy acceptance. In

24  Exhibit 8, the Navy Lab reported preliminary test results of Super Unibestos pipe covering and

25  block in response to tasking by the Navy's Bureau of Engineering. (See paragraphs 1 and 2, Page

26  3). Source of material and test protocols are defined in Exhibit 8 on Pages 4 and 5 in paragraphs

27  3 and 8. The remainder of the report cites the findings and conclusions. The final report,

28  Exhibit 9, provides official results of the tests, again citing authority for the conduct of the test,

MCKENNA LONG &
ALDRIDGE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DECLARATION OF DAN H. HEFLIN, JR. P.E. IN SUPPORT OF METALCLAD INSULATION CORPORATION'S NOTICE OF REMOVAL PURSUANT
TO 28 U.S.C. 1442(A)(1) (FEDERAL OFFICER)

1    and the conclusions. This evidence further demonstrates the Navy control over the development

2    and ultimate approval for use of the Unibestos materials. It is important to note that these tests do

3    not address the special requirements later invoked in Mil-I-24244, Exhibit 5.

4           14.    In the nuclear age, Navy engineering authorities deemed it necessity to <u>require</u>

5    <u>further testing for application of the Unibestos to nuclear piping</u>. That recognized need exceeded

6    the requirements of previous testing and certification under MIL-1-2781. Thus, the imposition of

7    MIL-I 24244 makes clear that the Navy invoked the new requirement for their direct oversight of

8    the production of the Metalclad-brokered shipment of Pittsburgh Corning Unibestos; and that this

9    specific lot of Unibestos was a government controlled product. The fact that MIL-1-24244 was

10   restricted from public dissemination further indicates that the Navy had highly sensitive design

11   interests in the *USS Guitarro*, the *USS Drum*, the *USS Hawkbill*, and the *USS Pintado*.

12          The purchase order (Exhibit 1) for the Unibestos insulation subject to MIL-1-24244 was

13   intended for use on stressed austenitic stainless steel (Page 29 of Exhibit 1), and was therefore

14   required to meet precise corrosion, chloride and fluoride specifications. On submarines, those

15   concerns apply uniquely to nuclear piping, and that application is noted (Nuclear Target) on Page

16   1 of the Purchase Order itself (Exhibit 1). That concern derives from the extremely adverse effect

17   of chlorides on stainless steel in the form of chloride stress corrosion. Such corrosion severely

18   degrades the strength of the piping, and introduces the probability of failure under stress. This is

19   clearly above and beyond the requirements for stock Unibestos that could be purchased by the

20   Navy pursuant to the QPL. The existence of MIL-1-24244 and it's application to the shipment of

21   Unibestos made by Metalclad demonstrates that other shipments of Unibestos insulation supplied

22   pursuant to the QPL only, i.e., not subject to the additional specifications of MIL-1-24244, would

23   not have been appropriate for use given the Navy's expressed additional requirements invoked for

24   materials intended for nuclear system application in the *USS Guitarro*, the *USS Drum*, the *USS*

25   *Hawkbill*, and the *USS Pintado*. Additionally, the Shipyard's own Chemical Laboratory

26   performed receipt testing of materials to validate the vendor's certificates; further attesting to the

27   sensitivity of the materials and the concern of the Navy that the materials be proper and suitable

28   for nuclear applications.

MCKENNA LONG &
ALDRIDGE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DECLARATION OF DAN H. HEFLIN, JR. P.E. IN SUPPORT OF METALCLAD INSULATION CORPORATION'S NOTICE OF REMOVAL PURSUANT
TO 28 U.S.C. 1442(A)(1) (FEDERAL OFFICER)

McKenna Long &
Aldridge LLP
Attorneys At Law
San Francisco

1    Attempts to obtain certified copies of MIL-I-24244 from the National Archives (NARA)

2 have not been successful.  A search by our contracted archivist of unclassified files at NARA did

3 not locate that specification.  Since the specification was originally classified but since

4 declassified, it is likely that NARA records of it are still on file in one of the many storage boxes

5 containing classified materials.  Thus, because of the original classification of MIL-I-24244, it

6 cannot be reasonably obtained from NARA.  The copy I have relied upon and attached hereto as

7 Exhibit 5 was obtained from Newport News Shipbuilding records and was produced by Naval

8 Ship Engineering Center in Hyattsville, Maryland.

9    I declare under penalty of perjury that the foregoing is true and correct and that this

10 declaration was executed on this 18th day of November, 2009 at Norfolk, Virginia.

11

12

13                                                      _____
                                                        DAN H. HEFLIN, JR.

SF:27396555.1

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28